C. MacNeil Mitchell
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Phone: (212) 294-6700
Fax:     (212) 294-4700

Attorney for Petitioner
Republic of Ecuador

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



| | |
|---|---|
| **REPUBLIC OF ECUADOR,**<br><br>                    Petitioner,<br><br>             -against-<br><br>**CHEVRON CORPORATION** and<br>**TEXACO PETROLEUM COMPANY,**<br><br>                    Respondents. | 09 Civ. ____( )<br><br>**PETITION TO**<br>**STAY ARBITRATION** |

Petitioner, Republic of Ecuador (the "Republic"), by and through its attorneys, Winston & Strawn LLP, seeks an order pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.,* and § 4 in particular, staying arbitration of the disputes described in Claimants' Notice of Arbitration (the "Notice") served by Respondents, Chevron Corporation and Texaco Petroleum Company, and in support thereof the Republic avers as follows:

<u>Parties, Jurisdiction and Venue</u>

1. Petitioner Republic is a sovereign nation.

2. Respondent Chevron Corporation ("Chevron Corp.") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 6001

Bollinger Canyon Road, San Ramon, California, USA 94583.

3. Respondent Texaco Petroleum Company ("TexPet") is a corporation organized and existing under the laws of Delaware, with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California, USA 94583. TexPet is a wholly-owned, indirect subsidiary of Texaco, Inc. ("Texaco"), a corporation with its principal place of business at the same address. After Texaco's acquisition by Chevron Corp. in 2001, TexPet became, and currently remains, a wholly-owned indirect subsidiary of Chevron Corp. For convenience and where appropriate, TexPet, Texaco and Chevron Corp. will sometimes hereinafter be referred to collectively as "Chevron."

4. This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws and treaties of the United States. Specifically, this action arises under or relates to (a) the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, dated June 10, 1958 and codified at 9 U.S.C. §§ 201 *et seq.*, (the "New York Convention"), as well as (b) the Treaty between the United States of America and the Republic of Ecuador Concerning the Encouragement and Reciprocal Protection of Investments, entered in force May 11, 1997 (the "Bilateral Investment Treaty" or "BIT").

5. This Court also has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(4), in that the matter in controversy (a) exceeds the sum of $75,000, exclusive of interest and costs, and (b) is between a foreign state (i.e., the Republic), as Petitioner, and citizens of a State or of different States (i.e., Chevron Corp. and TexPet), as Respondents.

6. This Court has personal jurisdiction over Chevron Corp. and TexPet because each is found, regularly transacts business, owns property, and is qualified to do business within the State of New York, and within the Southern District of New York. In addition, Chevron Corp. and

TexPet have each, in person or through an agent, transacted business within the State of New York from which the claims stated herein arise.

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391(c) because Chevron Corp. and TexPet are each corporations subject to personal jurisdiction within the State of New York, and within the Southern District of New York, and each has conducted activity in this judicial district giving rise to the claims herein.

<u>The Alleged Agreement to Arbitrate</u>

8. On or about September 23, 2009, Chevron commenced arbitration under the UNCITRAL arbitration rules alleging violations of the Bilateral Investment Treaty by mailing the Notice to the Republic (Ex. 1) (the "UNCITRAL Arbitration").

9. The Notice, in ¶ 70, refers to the definition of "investment dispute" found in BIT Article VI(I).

10. The Notice, in ¶¶ 71-72, identifies BIT Article VI(4) as constituting the Republic's offer to submit an "investment dispute" to binding arbitration under the UNCITRAL Rules at the election of an "investor" in Ecuador.

11. The Notice, in ¶¶ 6-21, purports to state Chevron's "investment" in the Republic and refers to Chevron as an "investor."

12. The Notice, in ¶¶ 30-69, purports to state an "investment dispute" between Chevron and the Republic, consisting of various allegations that the Republic breached provisions of the BIT by refusing to force the Superior Court located in Lago Agrio, Ecuador to dismiss a pending action against Chevron (the "*LA Aguinda*" action) brought by third parties (the "*LA Aguinda* plaintiffs").

13. The Notice, in ¶¶ 30-54, further alleges that the Republic's government "colluded"

with the *LA Aguinda* plaintiffs through public expressions of support for them, that its judiciary mishandled the *LA Aguinda* claim, and that those actions give rise to and constitute violations of the BIT by the Republic. The *LA Aguinda* plaintiffs are not respondents in the UNCITRAL Arbitration, nor can they be, since only a sovereign nation may be a respondent under the terms of the BIT.

14. Article VI of the BIT is the sole provision to which Chevron points as a purported basis for the jurisdiction of an UNCITRAL arbitration tribunal over the issues covered in the Notice.

The Predecessor *NY Aguinda* Lawsuit

15. From 1964 through June 1992, TexPet was a partial equity owner of an oil and gas exploration and development concession in the *Oriente* (Eastern) section of Ecuador's Amazonian rain forest (the "Concession"). TexPet also served as the sole Operator of the Concession for twenty-five years, from 1965-1990, with Ecuador's state-owned oil company acting as Operator during the last two-plus years of Texaco's tenure in Ecuador.

16. In 1993, three years after TexPet had relinquished its role as Operator of the Concession and just months after its equity interest in the Concession had expired, a group of indigenous people living in Ecuador's *Oriente* district filed a class action complaint against TexPet's indirect parent, Texaco, in the United States District Court for the Southern District of New York (the "*NY Aguinda* plaintiffs") seeking damages and restitutionary remedies for having allegedly polluted large portions of the *Oriente* while serving as Concession Operator. This action, styled "*Maria Aguinda et al. v. Texaco, Inc.*" (the "*NY Aguinda*" action), was assigned Civil Action No. 93 Civ. 7527 and ultimately assigned to the Honorable Jed S. Rakoff.

17. Texaco filed a pre-answer motion to dismiss *NY Aguinda* on the grounds of, *inter alia*,

*forum non conveniens* and international comity, arguing that every issue raised in the class action complaint should be tried in the courts of the Republic, where all the *NY Aguinda* plaintiffs were located, where the Republic could be impleaded as a party by Texaco for indemnification purposes, and where all the relevant documents and other items of evidence were located. The *NY Aguinda* plaintiffs vigorously opposed Texaco's motion, and numerous expert witness affidavits were filed on the *forum non conveniens* and international comity issues by both sides including, *inter alia*, affidavits on the adequacy of the Republic's courts to fairly and competently determine the issues involved. By the end of 2000, Texaco had submitted fourteen separate expert witness affidavits from distinguished Ecuadorian lawyers and legal scholars, all attesting to the fairness and competence of the Republic's courts to determine these issues.

18. Additionally, by 2001 TexPet had seven commercial lawsuits on unrelated contract matters pending against the Republic in Ecuadorian courts. Texaco touted the proceedings in those lawsuits to the *NY Aguinda* Court as demonstrating the fairness and competence of the Republic's judicial system, to induce the Court to dismiss *NY Aguinda* in favor of what Texaco claimed was the more appropriate Ecuadorian forum.

19. In 1996, after discovery, Judge Rakoff granted Texaco's *forum non conveniens* and international comity dismissal motion. *Aguinda v. Texaco, Inc.*, 945 F. Supp. 625 (S.D.N.Y. 1996). However, the dismissal order was reversed by the Second Circuit Court of Appeals, *sub nom Jota v. Texaco, Inc.*, and the case remanded with the condition that Texaco's motion should be granted only if it were (a) to consent to the jurisdiction of the Republic's courts to determine all issues raised in *NY Aguinda* and (b) to agree to certain other stated conditions, including a tolling of the applicable statute of limitations. 157 F.3d 153, 159 (2d Cir. 1998). After Texaco had consented to these and other conditions, both in writing and by representations of its

attorneys in open court, Judge Rakoff once again issued a decision dismissing *NY Aguinda* on *forum non conveniens* grounds. *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 539 (S.D.N.Y. 2001). In 2002, the *NY Aguinda* plaintiffs' appeal from this second dismissal was denied by the Second Circuit Court of Appeals, and Judge Rakoff's conditional dismissal decision was affirmed. *Aguinda v. Texaco, Inc.*, 303 F.3d 470 (2d Cir. 2002).

### *NY Aguinda* Refiled in Lago Agrio, Ecuador

20. In 2003, essentially the same *NY Aguinda* plaintiffs refiled their *NY Aguinda* action against Chevron, which had by then acquired Texaco and its subsidiaries as the *LA Aguinda* action, in the Superior Court located in Lago Agrio, Ecuador.

21. As had been true with respect to *NY Aguinda*, the *LA Aguinda* complaint did not name as a party the Republic or any of its agencies or instrumentalities. The parties to *LA Aguinda* were Chevron Corp., as defendant, and essentially the same indigenous people of the *Oriente*, as plaintiffs, who had been the *NY Aguinda* plaintiffs. Although it could have done so, and indeed implied to the *NY Aguinda* court that it would do so, Chevron made no effort to implead the Republic into the *LA Aguinda* proceeding but, as will be further discussed *infra*, instead unsuccessfully attempted to bring a separate AAA arbitration proceeding in New York (the "AAA Arbitration") against PetroEcuador, the Republic's state-owned oil and gas company.

22. The *LA Aguinda* litigation has proceeded in the Lago Agrio court since 2003, with numerous judicial site inspections, party-appointed expert reports, and court-appointed expert reports investigating and analyzing the extent and causes of pollution in the Concession area. In 2008 the court-appointed damages expert filed a 4,000 page report and a follow-up report estimating damages in a range up to US $27.3 billion. No decision has yet issued from the *LA Aguinda* court, although the evidentiary phase of the litigation is complete, and all that remains is

the submission by the respective parties of their written closing arguments.

<u>The AAA Arbitration and AAA Stay Action</u>

23. On June 11, 2004, Chevron served a Demand for Arbitration and Statement of Claim on PetroEcuador, seeking a declaration from an AAA Arbitration panel that PetroEcuador was contractually obligated to indemnify Chevron for all defense costs and liability that Chevron had incurred or might in the future incur in *LA Aguinda* (Ex. 2).

24. On October 15, 2004, PetroEcuador, joined by the Republic (hereinafter collectively referred to as the "Republic"), filed a petition to stay Chevron's AAA Arbitration in New York County Supreme Court (the "AAA Stay Action"). Respondent Chevron removed the AAA Stay Action to the District Court for the Southern District of New York, where it was docketed as Civil Action No. 04 Civ. 8378 and assigned to the Honorable Leonard B. Sand. On November 9, 2004, Chevron filed its Answer to Petition. On December 8, 2004, the Republic filed an Amended Complaint, adding additional claims for relief. On January 10, 2005, Chevron filed its Answer to Amended Complaint and Counterclaims, in which it sought indemnification from PetroEcuador and the Republic for any judgment and all defense costs incurred or to be incurred in the *LA Aguinda* action.

25. The principal issue in the AAA Arbitration, and subsequently a key issue in the AAA Stay Action, was whether or not the Republic was contractually bound by the terms of a 1965 Joint Operating Agreement ("JOA") that neither the Republic nor PetroEcuador had ever signed, but which bound its signatories, the initial concessionaires, to (a) arbitrate all disputes in New York and (b) indemnify TexPet, as Concession Operator, for certain liability to third parties arising from the Concession's exploration and drilling activities. Chevron alleged in the AAA

7

Stay Action that the JOA's arbitration and indemnification provisions were binding on PetroEcuador, and that the indemnification provision covered Chevron's defense costs and liability in defending the *LA Aguinda* actions.

26. In its Counterclaims, Chevron also asserted that, under a 1995 Settlement Agreement and 1998 Final Release, the Republic and PetroEcuador had released Chevron from liability for the claims asserted by the *LA Aguinda* plaintiffs. Chevron further alleged that the Republic was in breach of the 1995 Settlement Agreement and the 1998 Final Release by "allowing the Lago Agrio lawsuit to proceed" and by "refusing to inform the court in Lago Agrio that [the Republic] owned and released all rights to environmental remediation or restoration by TexPet in the concession area, without indemnifying [Chevron] and TexPet for any of their costs in that litigation." *Republic of Ecuador v. ChevronTexaco Corp.*, 376 F. Supp. 2d 334, 344 (S.D.N.Y. 2005).

27. In addition to seeking an award of costs, legal defense fees, and the amount of any adverse judgment which might be rendered against it in the *LA Aguinda* action, Chevron sought a declaratory judgment that:

> [T]he Republic and Petroecuador are in breach of their obligations under the 1995 Settlement and 1998 Final Release of Claims, and the Republic . . . and Petroecuador are obligated to intervene in the Lago Agrio litigation and inform the Ecuadorian court that they owned and released all rights to environmental remediation or restoration by TexPet in the concession area, and to indemnify and hold harmless TexPet and [Chevron] for any and all fees, costs and expenses relating to the Ecuadorian lawsuit, including any final judgment that may be rendered against [Chevron] in Ecuador.

*Id.* at 345. Chevron is currently seeking this identical relief once again in the UNCITRAL Arbitration. *See* Ex. 1 at ¶ 76(1)-(6).

28. Chevron argued that the 1995 Settlement Agreement and the 1998 Final Release not only released it from all environmental remediation and health claims against it held by the

8

Republic or PetroEcuador, but also released it from all claims held by third parties notwithstanding that (1) the 1995 Settlement Agreement had made no reference to the then pending *NY Aguinda* action, (2) the 1995 Settlement Agreement was narrowly drafted and released only claims held by the signatories to the Agreement, (3) the Republic would have had no basis under Ecuadorian law or its Constitution to waive rights held by third parties, and (4) a 1994 Memorandum of Understanding executed by the parties, and which served as the basis of the 1995 Settlement Agreement, specifically noted that that agreement would not prejudice rights of third parties.

29. Extensive discovery was taken in the AAA Stay Action. On June 19, 2007, after cross-motions for summary judgment had been filed and the court had held an evidentiary hearing on the content of applicable Ecuadorian law governing whether or not the Republic was contractually bound to arbitrate under the JOA, Judge Sand issued a decision and order permanently staying the AAA Arbitration on the ground that the Republic was not contractually bound by the JOA. *Republic of Ecuador v. ChevronTexaco Corp.*, 499 F. Supp. 2d 452 (S.D.N.Y. 2007). Chevron's counterclaims were not resolved in the decision and order. On appeal, Judge Sand's decision staying the AAA Arbitration was summarily affirmed *in toto* by the Second Circuit Court of Appeals. *Republic of Ecuador v. ChevronTexaco Corp.*, 296 F. App'x 124 (2d Cir. 2008). The United States Supreme Court denied *certiorari* on June 29, 2009. *ChevronTexaco Corp. v. Republic of Ecuador*, __ U.S. __, 129 S. Ct. 2862 (2009).

30. During the pendency of these appeals, Chevron initially insisted that its counterclaims relating to the 1995 Settlement Agreement and 1998 Final Release remained ripe for adjudication, and urged Judge Sand to schedule proceedings to rule on the pending cross-motions

for summary judgment with respect to the Chevron counterclaims.[1] Chevron simultaneously opposed the Republic's efforts to have the counterclaims dismissed for lack of subject matter jurisdiction.

31. Following the Supreme Court's denial of *certiorari* in June 2009, Chevron apparently thought better of having its remaining claims decided by Judge Sand (as it had urged less than a year earlier), instead advising the Court that "Chevron no longer wishes to press its opposition to The Republic's motion to dismiss all remaining counterclaims for lack of subject matter jurisdiction . . . . Dismissal for lack of subject matter jurisdiction would appear to moot the parties' cross-motions for summary judgment and . . . would conclude all proceedings before this Court."[2] In accordance with Chevron's decision to withdraw its opposition, on July 20, 2009, Judge Sand dismissed all remaining counterclaims in the AAA Stay Action. *Republic of Ecuador v. ChevronTexaco, Inc.*, No. 04 CV 8378 (S.D.N.Y. July 20, 2009). Shortly thereafter, Chevron formally withdrew its AAA Arbitration.

Chevron's Second Attempt to Have Its Breach of Contract Claims
Adjudicated by an Arbitral Panel Rather Than The *LA Aguinda* Court

32. Having lost its attempt to compel AAA Arbitration under the JOA, and having elected not to contest before this Court the dismissal of its release defense and indemnification claims against the Republic grounded on the 1995 Settlement Agreement and the 1998 Final Release, and notwithstanding the pendency of these same claims in the *LA Aguinda* action, Chevron has now made yet another attempt (by means of the current UNCITRAL Arbitration) to empanel an arbitral tribunal to seek the relief that it had previously sought in the unsuccessful AAA

---

[1] *See, e.g.*, Ex. 3, Letter from Jones Day to Judge Sand, October 30, 2008 at 7 ("Ecuador thus has fully litigated the counterclaims . . . and it should not be allowed now to escape a final resolution on the merits . . . . Accordingly, Chevron and TexPet request a status conference to schedule proceedings that will facilitate that resolution.").

Arbitration; namely, to circumvent the *LA Aguinda* court's jurisdiction by compelling the Republic to force the *LA Aguinda* court (a) to dismiss the *LA Aguinda* plaintiffs' claims, (b) to find Chevron not liable on the underlying environmental claims currently being litigated in *LA Aguinda*, and/or (c) to require the Republic to indemnify Chevron for all its past and future defense costs and liability in the *LA Aguinda* action.

33. The supposed bases for Chevron's requested relief in the UNCITRAL Arbitration are unfounded allegations and legal conclusions in direct opposition to those made by this Court. Apparently now regretting having convinced Judge Rakoff to send them from New York to Ecuador to determine liability for pollution damages; having lost an attempt before Judge Sand to compel the Republic to adjudicate its alleged obligations to Chevron in the AAA Arbitration; and having elected to allow its 1995 Settlement Agreement and 1998 Final Release claims pending before Judge Sand to be dismissed before adjudication on the merits; Chevron is now attempting to transfer the *LA Aguinda* case, as well as its counterclaims brought before Judge Sand, to UNCITRAL Arbitration. Chevron hopes that a panel of arbitrators can do what this Court, the Second Circuit, and the U.S. Supreme Court have all previously refused to do — compel the Republic to somehow force the *LA Aguinda* court to summarily dismiss the *LA Aguinda* plaintiffs' claims in a case to which the Republic is not even a party and in which it has no standing.

34. The instant UNCITRAL Arbitration is now Chevron's fifth bite at the same apple — *NY Aguinda*, *LA Aguinda*, AAA Arbitration, the AAA Stay Action, and now UNCITRAL Arbitration. This Court should not tolerate such tactics. Chevron's recourse to yet another arbitral forum — now UNCITRAL Arbitration — to claw the *NY Aguinda* and *LA Aguinda* issues

---

[2]   *See* Ex. 4, Letter from Jones Day to Judge Sand, July 13, 2009, at 1-2.

back from the *LA Aguinda* court, to which Chevron had transferred them in the first place, is unconscionable and cannot be tolerated.

35. <u>First</u>, Chevron obtained its *forum non conveniens* dismissal of *NY Aguinda* on the basis of its oral and written consents to transfer and submit all issues raised in *NY Aguinda* to the jurisdiction of the Republic's courts. Those exact issues are now, at Chevron's requests, pending before an Ecuadorian court in *LA Aguinda*. Significantly, to induce Judge Rakoff to dismiss *NY Aguinda* in favor of the Ecuadorian courts, Chevron also formally represented to Judge Rakoff on the record that it would satisfy any *LA Aguinda* judgment, reserving only the limited defenses to enforcement set forth in Section 5304 of New York's version of the Uniform Foreign Money-Judgments Recognition Act, codified at NY CPLR Article 53, entitled "Recognition of Foreign Country Money Judgments Act." (Ex. 5)[3] By now seeking through collateral UNCITRAL Arbitration to forestall any potential future *LA Aguinda* judgment against it, Chevron has not only acted prematurely but has violated those very specific formal representations and stipulations that it had used to induce Judge Rakoff to dismiss the *NY Aguinda* complaint and the Second Circuit to affirm his dismissal.

36. Applicable principles of waiver and judicial estoppel authorize this Court to enjoin Chevron from disobeying its judicial representations made to the *NY Aguinda* court, obligations voluntarily assumed by Chevron and relied upon by the Second Circuit in affirming Judge Rakoff's *forum non conveniens* dismissal.

37. <u>Second</u>, the UNCITRAL Arbitration's Notice names only the Republic as respondent,

---

[3]  Notice of Agreements in Satisfying *Forum Non Conveniens* and International Comity Conditions, submitted as Ex. 18 to Texaco, Inc.'s Memorandum of Law in Support of Its Renewed Motions to Dismiss Based on Forum Non Conveniens and International Comity, January 11, 1999, at ¶ 5 (Chevron "agrees to satisfy a final judgment (i.e., a judgment with respect to which all appeals have been exhausted), if any, entered against it in a Foreign Lawsuit in favor of a named plaintiff in *Aguinda*, subject to [Chevron's] reservation of its right to contest any such judgment under New York's Recognition of Foreign Country Money Judgments Act").

although the parties at risk in any award are primarily the absent nonparty *LA Aguinda* plaintiffs. Notwithstanding this, the Request for Relief set forth in the Notice (at ¶ 76) essentially seeks to compel the Republic to somehow forestall, prevent, or nullify any future judgment of the *LA Aguinda* court in favor of the *LA Aguinda* plaintiffs. For example, while its Notice complains (incorrectly) that the Republic's Government has wrongfully interfered with the *LA Aguinda* court in its pre-judgment proceedings, Chevron affirmatively seeks the Government's wrongful interference. Chevron actually asks the UNCITRAL arbitrators to order the Republic to interfere in *LA Aguinda* — to which it has never been a party and in which it has no standing — and "to inform the court . . . that TexPet, its parent company, affiliates, and principals have been released from all environmental impact arising out of the former Consortium's activities and that Ecuador and Petroecuador are responsible for any remaining and future remediation work."[4] Notice at ¶ 76(3). Chevron seeks nothing less than an award compelling the Republic's executive branch to wrest control of the case from its judiciary.

38. Chevron also seeks declarations from the UNCITRAL Arbitration panel that, pursuant to the 1995 Settlement Agreement and 1998 Final Release, (a) Chevron has "no liability or responsibility for environmental impact" and that (b) "Ecuador or Petroecuador is exclusively liable for any judgment that may be issued." *Id.* at ¶¶ 76(1), 76(4). Such relief would encroach directly upon the core underlying environmental liability and release issues that Chevron and the *LA Aguinda* plaintiffs are currently litigating in Ecuador. Chevron seeks this relief, of course, in a closed two-party investor-state UNCITRAL Arbitration forum before a tribunal to which the *LA Aguinda* plaintiffs would have no access, role, or right to be heard.

\* \* \* \*

---

[4] Chevron has already asserted this defense in the *LA Aguinda* court, so it does not need the Republic to be its proxy for this purpose.

39. From the outset of *LA Aguinda*, nothing stopped Chevron from impleading the Republic as a counterclaim-defendant, or from bringing a separate suit against it in Ecuador's courts (along with the seven others it then had pending) at the time *LA Aguinda* was filed. Instead, Chevron opted to go after the Republic in a separate forum, the AAA Arbitration, in supposed reliance on an unsigned JOA, despite the fact (as Judge Sand explicitly found in his Decision and Order) that Chevron's senior management had in fact known all along that the Republic was not bound by the JOA. *Republic of Ecuador v. ChevronTexaco Corp.*, 499 F. Supp. 2d at 468.

40. Furthermore, Chevron is currently trying to use UNCITRAL Arbitration as a ploy to obtain relief nominally against the Republic, but in actuality against absent parties — the *LA Aguinda* plaintiffs. Chevron is asking an UNCITRAL Arbitration panel, without input from the *LA Aguinda* plaintiffs (who cannot be joined in the UNCITRAL Arbitration), to issue an award compelling the Republic's Government to arm-twist one of its courts to arbitrarily exonerate Chevron from its liability, if any, to the *LA Aguinda* plaintiffs. Ironically, Chevron claims that the Republic's principal wrongdoing, asserted as the basis for the BIT relief sought, is that its courts are insufficiently independent of the executive branch. Not only is Chevron's requested relief antipodal to the manner in which the independent judiciary of Ecuador operates, as well as contrary to Chevron's numerous representations to Judge Rakoff about the independence of the Republic's judicial system, it is completely disingenuous — just as if A complained that B had violated the law in favor of C, and for relief was seeking an award compelling B to commit the same violation of law in A's favor.

41. Of course, no judgment has yet been rendered in *LA Aguinda*. Even if successive recourse to the AAA and UNCITRAL Arbitrations were not in violation of its promise to the *NY*

*Aguinda* court, Chevron cannot claim that the *LA Aguinda* court has mishandled the case before the legal issues have been decided and a judgment entered.

42. The UNCITRAL Arbitration is currently in its infancy. While Chevron has appointed its own party-appointed arbitrator, the Republic has not yet appointed its arbitrator, and the two party-appointed arbitrators have not yet selected a tribunal President. For that reason, this petition is timely.

43. In sum, in pursuing the UNCITRAL Arbitration, Chevron is violating its representations to the *NY Aguinda* court. This court should not tolerate such tactics, and should grant a permanent stay of arbitration to enforce Chevron's representations on the basis of which it dismissed *NY Aguinda*.[5]

## Relief Requested

44. As a result of the foregoing, the Republic is entitled to an order and judgment:

A. Preliminarily and permanently enjoining Chevron Corp. and TexPet from prosecuting or continuing to prosecute the UNCITRAL Arbitration set forth in the Notice and to thus violate their judicial representation not to contest any judgment except as allowed under New York CPLR Section 5304 (a) and (b).

B. Granting such other and further relief as justice requires.

Dated: New York, New York
December 3, 2009

                Respectfully submitted,

                C. MacNeil Mitchell
                **WINSTON & STRAWN LLP**
                200 Park Avenue

---

[5] This Petition is not intended to, and should not be construed to, seek any judicial intervention beyond a stay of arbitration. Any claim which could be construed as requesting relief beyond such a stay is withdrawn.

New York, NY 10166<br>
Phone: (212) 294-6700<br>
Fax:   (212) 294-4700

By: _____

C. MacNeil Mitchell

Eric W. Bloom
Tomás Leonard
**WINSTON & STRAWN LLP**
1700 K Street, N.W.
Washington, D.C. 20006
Phone: (202) 282-5000
Fax:   (202) 282-5100

Ricardo Ugarte
**WINSTON & STRAWN LLP**
35 West Wacker Drive
Chicago, IL 60601
Phone: (312) 558-5600
Fax:   (312) 558-5700

**Attorneys for Petitioner
Republic of Ecuador**